IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 09-20047-CIV-GOLD/McALILEY

EL DORADO TOWERS
CONDOMINIUM ASSOCIATION, INC.,
    Petitioner,
vs.
QBE INSURANCE CORPORATION,
    Respondent.
_____/

**PETITIONER, EL DORADO TOWERS CONDOMINIUM ASSOCIATION, INC.'S RESPONSE TO RESPONDENT, QBE CORPORATION'S, MOTION FOR SUMMARY JUDGMENT**

Petitioner, El Dorado Towers Condominium Association, Inc. (hereinafter "El Dorado") by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and Local Rule 7.5 hereby files this, its Response to Respondent, QBE Insurance Corporation's, (hereinafter "QBE") Motion for Summary Judgment and states as follows:

**I. BACKGROUND**

1. El Dorado is comprised of two twenty-seven story high-rise towers, a separate two-level parking structure located at the north of the properties, and a single-story parking garage in between the two towers features a suspended swimming pool and recreational/common area structure above. *See* Report of Andy Fuxa, Jr. GC, filed with this Court as D.E. 54.

2. The concrete towers are almost indistinguishable in size and design and were constructed in 1974. *See* Report of Andy Fuxa, Jr., GC, filed with this Court as D.E. 54.

3. On October 24, 2005, El Dorado was struck by Hurricane Wilma, including high winds and a tornado which affected Tower III. *See* Report prepared by Rocco Calaci of LRC Services dated October 19, 2009, and filed with this Court as D.E. 56.

4. On the date Hurricane Wilma struck El Dorado, the condominium was insured by QBE through a commercial property insurance policy, number QF2950-06, covering each tower building on a replacement cost basis for $15,930,500.00 and the parking area structure on a replacement cost basis of $2,505,000.00. The Policy period began 02/01/2005 and expired 02/01/2006. Additionally, each building had an additional amount of $125,000.00 for contents coverage. The applicable deductible for a named windstorm was $692,320.00. *See* QBE Insurance Policy attached as Exhibit "A" to El Dorado's Petition for Declaratory Judgment (D.E. 1).

5. The force of the winds generated by Hurricane Wilma compromised the exterior shell of the towers from rooftop to ground level. Once the exterior envelope of the buildings was breached, it literally allowed the positive and negative wind forces to blow down numerous interior partition walls. *See* Report of Andy Fuxa, Jr., GC filed with this Court as D.E. 54.

6. At the time of Hurricane Wilma the Board of Directors of El Dorado was comprised of 7 people of whom 4 were senior citizens; Murray Frank, President, date of birth 7/6/39, (Deposition Transcript of Murray Frank page 6 line 3, D.E. 51); Frank Levy, Treasurer, date of birth 3/29/22, (Deposition Transcript of Frank Levy page 6 line 12, D.E. 48); Richard Turchen, date of birth 4/1/30, (Deposition Transcript of Richard Turchen page 6 line 20 D.E. 47); and Evelyn Yannitelli date of birth 5/9/20, (Deposition Transcript of Evelyn Yannitelli, page 6 line 1 D.E. 49).

7. The Property Manager, William Schob, was also a senior citizen on the date of Hurricane Wilma. Mr. Schob's date of birth is 3/31/28, (Deposition Transcript of William Schob page 9 line 2, D.E. 52).

8. El Dorado retained the services of a licensed Public Adjuster, Joseph Zevuloni, to assist in the presentation of the complex claim including the assessment of damages and preparation of a two thousand nine hundred and thirty nine page (2,939) line item estimate of damages sustained by El Dorado as a result of Hurricane Wilma. That detailed estimate was provided to QBE less than five months after the loss. *See* Affidavit of Andrew Bertucci, Exhibit A to Respondent's Statement of Material Fact and Exhibit A.2 to that Statement.

9. In its continuing efforts to properly present its claim for catastrophic damages occasioned by Hurricane Wilma, El Dorado also retained the services of counsel, David Avellar Neblett, and provided notice of his retention to QBE. *See* Exhibit C to Affidavit of Murray Frank D.E. 55.

10. El Dorado made multiple written requests to QBE for a certified copy of the complete Policy so that it could be aware of all duties it had under the Policy. Written request was made by Attorney Neblett on January 31, 2006, (Exhibit C to Affidavit of Murray Frank D.E. 55); Attorney Hugh Lumpkin on June 26, 2007, (Exhibit A.9 to QBE's Statement of Material Facts D.E. 42); and Attorney Robert A. Reynolds on February 26, 2008, (Exhibit A.10 to QBE's Statement of Material Facts D.E. 42).

11. El Dorado in good faith submitted its estimate of Hurricane Wilma damages on February 17, 2006 yet was still requesting in writing QBE's estimate as of July 20, 2007, (Exhibit A.9 to QBE's Statement of Material Facts D.E. 42).

12. El Dorado, in an ongoing effort to present an accurate scope of damages commissioned an engineering firm, Hart Weidlinger and Associates, to study the structural issues at El Dorado and issue a report of their findings. The report details several life safety concerns existing in the buildings due to Hurricane Wilma. That report was sent to QBE but QBE failed to provide its engineer's report to El Dorado. *See* Exhibit H to Affidavit of Murray Frank D.E. 55.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56, as the movant, Respondent bears the burden of proving the nonexistence of any issue of material fact, and the burden to show that it is entitled to a judgment as a matter of law. Summary Judgment cannot be granted where a dispute about a material fact exists, so that the evidence could support a reasonable jury returning a verdict for the nonmoving party. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence in determining the truth of the matters asserted by the parties, but to determine whether there is a genuine issue for trial. *See* Id.

After the moving party has met its initial responsibility of informing the court the case of the basis of its motion identifying those portions of the pleadings, depositions, answers to interrogatories which it contends demonstrate the absence of a material fact, the nonmoving party must designate specific facts showing that there is a genuine issue for trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.Ed 2d 265, 106 S. Ct. 2548 (1986). The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in his favor. *See* Anderson, 477 U.S. at 255. An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. The substantive law will identify which facts are material and which are irrelevant. *See* Id. at 248.

### III. ARGUMENT

A. Examinations Under Oath

QBE made an assumption that it was entitled to have unit owners submit to EUOs as additional insureds under the Policy. The subject of those EUOs was to the prior damage to the condominium complex, previous repairs to the balconies, maintenance issues, and Hurricane Wilma damage. That interpretation differs from what could reasonably be expected from reading the Policy provisions pertaining to coverages. Unit owners were not additional insureds with respect to the building per se. They could only be construed as additional insureds with respect to fixtures, installations and/or additions as reflected in Endorsement CP 01 91 01 04, Section B.1.(g). That coverage was further restricted by subsections (1) and (2) of (g):

(1) Initially installed in accordance with the original plans and specifications, or replacements of like kind or quality as those initially installed; or

(2) As existed at the time the unit was initially conveyed, if the original plans and specifications are not available.

The Policy language does not convey the benefit of being full additional insureds to the unit owners. Only those unit owners whose fixtures, installations or additions met the specific criteria for coverage could be considered additional insureds within the parameters of the Policy. If they were not additional insureds they didn't have even an arguable obligation to sit for an EUO. QBE made no attempt to discern if the unit owners and in one case former unit owner had units which contained insured fixtures, installations and/or additions.

Under Florida law if an insurance policy contains ambiguous language the court is required to construe it in favor of the insured and against the insurer. *See* Powersports, Inc, v. Royal & Sunalliance Insurance Co., 307 F. Supp. 2d 1355, 1359 (S.D. Fla 2004). QBE's contention the Policy required unit owners to provide EUOs is a contested issue of material fact.

It is QBE's burden to prove the unit owners were "additional insureds" and they willfully failed to comply. Because insurance agreements/policies are prepared by experts in a complex field, public policy dictates that courts interpret insurance policies in the manner most favorable to the insured. *See* Travelers Ins. Co. v. Bartozewicz, 404 So.2d 1053, 1054 n.4 (Fla. 1981)(citing Praetorians v. Fisher, 89 So.2d 329, 333 (Fla. 1956).

In the instant action QBE had a heightened obligation to ensure the aged unit owners who might be additional insureds understood the Policy terms and provisions. The primary adjuster handling the claim on behalf of QBE, Sanford B. Siegel, had the designation of General Adjuster and was required to be familiar with the Adjuster Code of Ethics codified in 69B-220.201, including subsection (3)(h): "An adjuster shall exercise extraordinary care when dealing with elderly clients to assure that they are not disadvantaged in their claims transactions by failing memory or impaired cognitive processes." QBE was put on notice multiple times that many residents at El Dorado were aged. (*See* Exhibit D to Affidavit of Murray Frank D.E. 55); (Exhibit A.8 to QBE's Statement of Material Facts D.E. 42).

Instead of complying with the mandate of 69B-220.201(3)(h), QBE told Mr. Frank, the senior citizen volunteer Board President to "review your policy in its entirety so that you are aware of all of the Policy terms, conditions, and requirements." See Exhibit A.3 to QBE's Statement of Material Facts D.E. 42. Mr. Joseph Zevuloni,, PA was also advised by Mr. Siegel "review the policy in its entirety with the insured, so that the insured fully understands all of the terms, conditions and duties stated in the policy." *See* Exhibit A.3 to QBE's Statement of Material Facts D.E. 42. There was no offer on Mr. Siegel's part to ensure the insured was apprised of the terms and conditions of the Policy even in light of the insured's continued written requests to QBE to send a certified copy of the Policy.

Murray Frank provided an EUO to QBE in his capacity of corporate representative. El Dorado's property manager also provided an EUO although he was not an insured and El Dorado was not under any obligation to produce Mr. Schob. In its Motion for Summary Judgment QBE alleges a failure to comply with policy conditions because both Mr. Frank and Mr. Schob deferred to the licensed public adjuster in a number of issues. That is not the test under Florida law for compliance. That standard is provided in Florida Gaming Corporation v. Affiliated FM Insurance Company, 502 F. Supp.2d 1257 (S.D. Fla. 2007). The named insured in that case was Florida Gaming Corporation, Inc. Florida Centers, Inc d/b/a Miami Jai-Alai, Fort Pierce Jai-Alai. Florida Gaming contended that when the named insured is an entity and not a person, the named insured had the right to choose the representative to be examined. Citing Law and Pract. of Ins.Coverage Litig., § 3:11 n. 33 (Parham v. Church Mut. Ins. Co. 53 Ark. App. 68, 918 S.W. 2d 214 (Ark. App. 1996) reh'g granted and opinion vacated on other grounds, 53 Ark. App. 194, 922, S.W. 2d 724 (1996) superseded on other grounds. Florida Gaming asserted that it chose Mr. Licciardi as the corporate officer with the most knowledge of the topics requested by Affiliated; while he admittedly had little knowledge regarding the repair and damage estimates in the proof of loss, Florida Gaming claimed appraisal was the correct mechanism to resolve questions regarding discrepancies in the cause and scope of the claim. The court found that Mr. Licciaardi's lack of specific knowledge did not disqualify him as the person with the most knowledge. In support of its opinion the court cited to Paulucci v. Liberty Mut. Fire Ins,. Co., 190 F. Supp. 2d 1313, 1325-27 (M.D. Fla. 2002). The representative of the insured in that case deferred to others during questions and the court determined there was no indication that he was not the most knowledgeable person to respond to the questions asked. In the instant action Mr. Murray Frank was directly asked in his EUO "Are you the person with the most information

regarding the Association?" (EUO of Murray Frank, August 9, 2006, p. 15 lines 13-14). He responded unequivocally "As far as the Association and the claim, I would say, yes. As to what is going on with the claim you mean?" [Question] "Right." [Answer] "Yes. I would say yes." (EUO of Murray Frank, August 9, 2006, p. 16 lines 4-8.) The court in Florida Gaming declined to grant the insurer's request for Summary Judgment based on the contention that the insured had failed to comply with policy conditions by submitting only Mr. Licciardi for an EUO and not the retained public adjuster or the maintenance supervisor. The insurer had argued, similar to the argument of QBE in the instant case, the insured was required to produce additional people for EUOs because the representative who was produced had no personal knowledge about the loss and damage amounts contained in the proof of loss. In Florida Gaming the corporate representative testified he was relying entirely upon the public adjuster to conduct the analysis of the damages. In the instant case Mr. Frank testified the public adjuster assessed the loss and determined what were Hurricane Wilma damages. (EUO of Murray Frank, August 9, 2006, p. 68 lines 14-20; p. 69 lines 8-10.) Mr. Frank further testified the Board (of the Association) did not have enough knowledge to review the estimate prior to its submission to QBE. (EUO of Mr. Frank, August 9, 2006, p. 70, lines 11-15.)

The Policy issued to El Dorado provides for the insured to take the EUO of "any insured" in the event of a loss claim. Unlike some insurance policies it does not state the insured must produce any public adjuster it has retained for an EUO. Thus at the time the Policy was issued there was no contemplation the named insured would be required to produce its public adjuster for an EUO. As stated in Couch on Insurance ,3ds 196:2: "When evaluating an insurer's rights to investigation of a claim, the insurer's rights tend to be measured by 'reasonableness,' with the court's attempting to balance the insurer's legitimate interest in ascertaining the validity and

extent of the claim against the insured's…rights to both privacy and prompt payment of sums due under the terms of the contract."

In the El Dorado Policy the term "any insured" is utilized regarding the requirements of an EUO. That verbiage does not put the insured on any notice the term could be expanded to include employees, representatives, agents, and others who assisted the insured in formulating the claim. Thus, the insured is entitled to the more restrictive meaning of "any insured" as to who is actually insured under the policy and not third parties. Additionally, QBE by drafting the Policy language is required to prove the individuals it sought to provide EUOs were actually additional insureds. It failed to meet that burden. Correct policy interpretation requires a reading of "each unit owner will be considered an additional insured." In light of the restrictions placed in B.1.g, above that phrase. If a unit owner meets the criteria established in B.1.9, then that unit owner is an additional insured. QBE failed not only to prove each unit owner it sought and EUO from met the parameters of B.1.g., it failed to even undertake that investigation.

QBE's original request to El Dorado regarding Examinations Under Oath included two individuals over the age of eighty and one individual who had neither been a unit owner nor a resident at El Dorado for approximately seven (7) years. QBE was notified of those facts and further advised those elderly people had no knowledge regarding the scope of loss. *See* Exhibit 8 to Affidavit of Andrew Bertucci.

QBE was also requested to provide contractual language or authority authorizing the insurer to take an examination of Joseph Zevuloni, P.A. as non-insured. *See* Exhibit 8 to Affidavit of Andrew Bertucci.

Four of the five people QBE contends it wanted to take the EUOs of, including Richard Turchen, Frank Levy, Deborah Lazar, and Evelyn Yannitelli, all gave depositions in this matter.

The fifth individual, Barry Yalikoff, was not even requested to provide a deposition. QBE had an opportunity during each of those depositions to determine whether any of those people qualified as an "additional insured" unit owner pursuant to the Policy provisions of B.1.g.  QBE declined in its examinations to ask the requisite questions.  Therefore, for purposes of its Motion for Summary Judgment QBE has no proof to offer this Court.

### B. PROOF OF LOSS

The Policy issued to El Dorado required the insured to send a signed, sworn proof of loss to QBE within 60 days of QBE's request.  The insured was to provide information necessary to QBE's investigation of the claim.  While the Policy stated the necessary forms would be supplied, it did not state the insured was required to utilize only those forms.  If the Policy mandates an action the insured must be notified it is a requirement and not simply a convenience for the insured.  Immediately after its loss El Dorado began assembling the information necessary to complete a proof of loss.  To assist in compiling the requisite information El Dorado retained the services of a Florida licensed public adjuster, a professional engineering firm and an attorney.  El Dorado's goal was to provide a competent estimate of damages reflecting its multi million dollar catastrophic loss.  The fear of El Dorado was the consequences of inadvertently providing an estimate which might contain inaccuracies is thus expressed by Attorney R. Hugh Lumpkin in correspondence to QBE's Attorney Deborah Bain "We know – everyone does – that if a proof of loss is not accurate to a "T" your client will cry fraud and use the most modest of disagreements as a basis to assume its thug persona." *See* Exhibit A.9 to QBE's Statement of Material Facts D.E. 42.

QBE alleges but evidences not a scintilla of proof that it suffered any prejudice due to the timing of El Dorado's service of a proof of loss.  To prevail on a lack of cooperation

argument QBE must demonstrate prejudice. Throughout the investigation El Dorado opened its condominium to multiple onsite inspections by QBE's team of engineers. Furthermore El Dorado provided over 11,000 documents to QBE.

### III.   CONCLUSION

QBE is not entitled to a summary judgment because there are relevant material issues of fact as demonstrated by El Dorado in this response.

WHEREFORE, El Dorado respectfully requests this Court deny QBE's Motion for Summary Judgment in its entirety.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 26th day of January, 2010, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

> ____/s/ Jean Frances Niven_
> Jean Frances Niven, Esq.
> Florida Bar No.: 407607
> William F. Merlin, Jr.
> Florida Bar No.: 364721
> MERLIN LAW GROUP, P.A.
> 777 South Harbour Island Blvd
> Suite 950
> Tampa, FL 33602
> Tel: (813) 229-1000
> Fax: (813) 229-3692
> jniven@merlinlawgroup.com
> cmerlin@merlinlawgroup.com
> Attorneys for Plaintiff

### SERVICE LIST

**El Dorado Towers Condominium Association, Inc. v. QBE Insurance Corporation**

**Case No.: 09-20047-Civ-Gold/McAliley
United States District Court, Southern District Of Florida**

William S. Berk, Esquire
wberk@berklawfirm.com
Berk, Merchant & Sims, PLC
2100 Ponce De Leon Boulevard
PH1
Coral Gables, Florida 33134
Telephone: (786) 338-2900
**Facsimile: (786) 338-2888**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

Deborah Bain, Esquire
dbainlaw@aol.com
C. Deborah Bain, P.A.
840 N. Federal Highway
Suite 305
North Palm Beach, Florida 33408
Telephone: (561) 630-1917
**Facsimile: (561) 630-1918**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

J.J. Wicker, II, Esquire
dmacleod@wickersmith.com
Wicker, Smith, O'Hara, McCoy & Ford, P.A.
1645 Palm Beach Lakes Boulevard
Suite 700
West Palm Beach, Florida 33402
Telephone: (561) 689-3800
**Facsimile: (561) 689-9206**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

Rachel Studley, Esquire
rstudley@wickersmith.com
Wicker, Smith, O'Hara, McCoy & Ford
1645 Palm Beach Lakes Boulevard
Suite 700
West Palm Beach, Florida 33402
Telephone: (561) 689-3800
**Facsimile: (561) 689-9206**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

William F. Fink, Esquire
WFink@wickersmith.com
Wicker, Smith, O'Hara, McCoy & Ford, P.A.
Grove Plaza, 5th Floor
2900 SW 28th Terrace
Miami, FL 33133
Telephone: (305) 448-3939
**Facsimile: (305) 441-1745**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

Constantine G. Nickas, Esq.
CNickas@wickersmith.com
Wicker, Smith, O'Hara, McCoy & Ford
Grove Plaza, 5th Floor
2900 SW 28th Terrace
Miami, FL 33133
Telephone: (305) 448-3939
**Facsimile: (305) 441-1745**
Attorneys for Respondent
Electronic Filing generated by CM/ECF

Damian D. Daley, Esquire
DDaley@wickersmith.com
Wicker, Smith, O'Hara, McCoy & Ford, P.A.
1645 Palm Beach Lakes Boulevard
Suite 700
West Palm Beach, Florida 33402
Telephone: (561) 689-3800
**Facsimile: (561) 689-9206**
Attorneys for Respondent
Electronic Filing generated by CM/ECF